UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOHNNIE M. GARCIA, III,

            Petitioner,

    -vs-

HAROLD GRAHAM, SUPERINTENDENT OF
AUBURN CORRECTIONAL FACILITY

          Respondent.

_____

**DECISION AND ORDER**
**No. 11-CV-0870(MAT)**

## I.   Introduction

*Pro se* Petitioner Johnnie M. Garcia, III ("Petitioner") has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered July 9, 2007, in New York State, County Court, Chemung County, convicting him, after a jury trial, of Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law ("Penal Law") § 265.03[1][b]) and two counts of Criminal Possession of a Weapon in the Third Degree (Penal Law § 265.02[1], [4]). Petitioner was sentenced to an aggregate indeterminate prison term of 15 years, plus five years of post-release supervision.

## II.   Factual Background and Procedural History

### A.   Indictment

By Chemung County Indictment No. 2006-351, filed on November 17, 2006, Petitioner was charged with one count of second-degree

weapons possession, and two counts of third-degree weapons possession. See Resp't Ex. D.

**B.    The Trial**

**1.    The People's Case**

At about 2:00 a.m. on October 8, 2006, Officer Richard Comstock ("Comstock") ("Officer Comstock") monitored speeding traffic with a radar gun at the intersection of William and Church Streets in Elmira, New York. Trial Trans. [T.T.] 125-127. Comstock observed a tan Pontiac minivan chasing a green Jeep Cherokee on the southbound side of William Street. The Jeep turned right onto Church Street and then sped down that street. T.T. 131. The minivan stopped at the intersection, then turned to follow the Jeep. As the minivan started to turn, Officer Comstock saw Petitioner lean out of the front passenger side window of the vehicle and fire five or six shots from a handgun. T.T. 132. Petitioner, who was not driving, wore a white "do-rag" and a white sweatshirt with dark stripes on the shoulders. T.T. 133, 167. Officer Comstock was about 20 or 25 paces from Petitioner when he fired the shots. T.T. 167. The handgun was semi-automatic, as it ejected shells as Petitioner fired it. T.T. 134.

Officer Comstock transmitted a "shots fired" radio message and the location of the shots. T.T. 135. He pulled behind the minivan, which stopped. Officer Comstock waited behind the stopped minivan for assistance to arrive, and radioed the license plate to

headquarters.  He then saw Petitioner exit the front passenger door of the minivan and run.  T.T. 135-137, 174.  In the meantime, Officer Comstock lost sight of the Jeep.  T.T. 137.

Officer Comstock then radioed that he would pursue Petitioner, and saw him run north around a church and across a parking lot toward an alley called Academy Place.  T.T. 138-139, 140.  Officer Comstock drove up Lake Street to try to stop Petitioner who ran toward William Street.  T.T. 139, 141, 176.

At that point, Officer Todd Adams was working in the police building when he heard "several shots" close by, and ran from the building to Lake Street.  T.T. 190.  Officer Comstock also saw Officer Adams run from the building.  T.T. 141.  Officer Adams saw Petitioner, a light-skinned black male wearing a white-colored jacket, jeans, and "some sort of hat," run "full sprint" around the side of the church.  T.T. 190.  As Officer Comstock followed them in his patrol car, Petitioner ran behind some bushes alongside a law office building.  T.T. 143, 192, 208.

Officer William Solt arrived at William Street, near the law office building.  T.T. 220.  He turned his spotlight onto the building and saw Petitioner standing in front, in the bushes.  T.T. 220.  Officers Solt, Adams, and Comstock ordered Petitioner, several times to walk out from the bushes.  T.T. 143-144, 221.  Ultimately, Petitioner walked out with his hands up and the

officers arrested him.  T.T. 144, 221.  Petitioner was wearing only one boot when he was arrested.  T.T. 149, 221.

Officer Adams found one Timberland boot in a parking lot near the law office, a Sig Sauer handgun near a grassy corner of that building, and a magazine clip in that parking lot.  T.T. 195-201, 246.  The gun was cocked in the firing position.  T.T. 248. Officer Zachary Stewart also found a black and white cap bearing the Yankees insignia in the parking lot.  T.T. 253.

Police found six 9 millimeter shell casings on the northwest corner of William and Church Streets.  T.T. 258.  Officers Stewart and Scott Packard observed a bullet hole in a double-paned window of an office at 412 East Church Street.  T.T. 262, 275-276.  They obtained entry to the building, where they saw a bullet resting on the inside window pane.  T.T. 263, 275-277. Officer Solt also observed a fresh chip, consistent with a bullet strike, on the brick building next to 412 East Church Street.  T.T. 226.

Officers Solt, Packard and Comstock went to the registered address of the green Jeep Cherokee, and saw it parked in the driveway.  T.T. 155, 223, 233, 279.  The Jeep owner, Patricia Freemen ("Freemen"), told them that her son Grant had been driving it earlier that evening, and that Grant was not at home.  T.T. 157, 235.  The officers showed her that the Jeep had tailgate damage, which was consistent with that of a bullet strike, and a bullet hole in the passenger side front door.  T.T. 156-157, 160, 223-224,

236, 279-280, 315-316.   Police impounded the Jeep and Sergeant David Kinnaird subsequently recovered a small projectile from inside the door.   T.T. 315-316.

In the meantime, at police headquarters, Officer Comstock advised Petitioner of his <u>Miranda</u> rights.   T.T. 150.   Petitioner had a hole at the end of his right sweatshirt sleeve, and, in a booking photo, Petitioner's thumb could be seen poking through that hole.   T.T. 152-153, 161, 204.   Officer Comstock told Investigator Richard Weed that he had advised Petitioner of his <u>Miranda</u> warnings, and Petitioner told the sergeant that he understood those rights, and that Petitioner wanted to talk to the investigator. T.T. 294-295.

Petitioner told Investigator Weed that he was "jumped" by "several black males" at Zamboni's bar, which is not in the vicinity of William and Church Streets.   T.T. 295-296.   Petitioner then ran up to West Church Street with a white female he knew only as "Tarren".   T.T. 295.   At College and Church Streets, Petitioner encountered someone he knew only as "L" driving a minivan. T.T. 296.   Petitioner entered the van and along with "L", there was a black male in the minivan, whom Petitioner did not know, who wore a white "do-rag" and hooded sweatshirt.   T.T. 296, 297, 299.   This man told Petitioner "the shit is about to get crazy," and then someone started shooting from within the minivan.   T.T. 297. Petitioner became frightened, left the van and ran.   T.T. 297.

Petitioner did not admit to Investigator Weed that he was the shooter. T.T. 301.

That night, Officer Comstock telephoned Kimberly Long ("Long"), Petitioner's mother. T.T. 159. Long went to the police station and told the officers that she had loaned her 1999 gold Montana minivan to Petitioner a few days earlier. T.T. 159, 239-240. The rear hatch door of the minivan contained a bullet imprint. T.T. 160. Long also identified Petitioner's sweatshirt, which had two holes in the sleeve. Each hole had blackened fibers around it. T.T. 161.

New York State Police Sergeant James Campbell examined the black stain on Petitioner's sweatshirt. T.T. 323-325. He found no particulate matter when he viewed the black stain under a microscope. T.T. 327. After testing the matter, he found no nitrates and no lead, and thus concluded that the black sootiness was not gunshot residue. T.T. 327, 338-339. He testified that gunshot residue is not normally found on a shooter's clothing because it exits the barrel in the direction of the projectile. T.T. 328.

Sergeant Campbell examined the Sig Sauer and the six expended shell casings, the deformed 9 millimeter bullet, and bullet fragment found by the officers. T.T. 327-328, 330. He test-fired the gun, and found it was operable. T.T. 323-333. The deformed slug was consistent with having been fired from the Sig Sauer.

T.T. 335, 341.  Sergeant Campbell, however, could not determine the caliber of the deformed fragment.  T.T. 336.  The six spent shell casings were consistent with each other, and with the shells that he had used to test-fire the Sig Sauer.  T.T. 336-337.

### 2.  The Defense's Case

Elijha Merritt ("Merritt"), Petitioner's friend since elementary school, testified that Petitioner was not the shooter. T.T. 352-355.[1]  At 8:30 p.m. on October 7, 2006, Petitioner had called Merritt and asked him to purchase a bottle of Jaggermeister for Petitioner.  T.T. 356-381.  Merritt went to a residence on Gray Street to give Petitioner the bottle, and then borrowed Petitioner's van to drive to a Motel 6 to visit a friend. T.T. 356, 383-384, 388.  Subsequently, Petitioner called Merritt and instructed him to go to a residence to purchase three bags of marijuana for $50.  T.T. 357, 385.  Merritt went to the house and told a woman there that she was Petitioner's friend.  T.T. 357. She allowed him to enter the house, and saw two men, one of whom he knew as "Killer".  One asked if he was with Petitioner.  Merritt replied that he was not, and he asked why they wanted to know. T.T. 358.  Killer told him that the men had planned to ask

---

[1]    At the time of the trial, Merritt was incarcerated in the county jail on drug-sale and weapons-possession charges. T.T. 376, 379.  He had previously been convicted of third-degree sale of marijuana in 1998, fifth-degree marijuana possession in 1999, third-degree robbery in 2000, seventh-degree drug possession twice in 2000, resisting arrest in 2005, and possession of contraband while incarcerated.  T.T. 376-378.

Petitioner for a ride.   T.T. 358, 388.   After the woman handed Merritt the marijuana, Merritt agreed to give the men a ride. T.T. 358-359.

With the men in the van, Merritt picked up Petitioner from Gray Street.   T.T. 359, 360, 389.   Killer sat in the front passenger seat, wearing a red shirt, a white "hoodie" and a white "do-rag".   T.T. 359, 260.   Petitioner sat behind Killer.   T.T. 361. Merritt drove up Second Street and Petitioner, unhappy about the music selection, set about selecting a different compact disk. T.T. 363.   At Second and William Streets, Merritt saw a Jeep Cherokee coming toward him.   Killer said, "there go my peoples, I will just have them give me a ride."   T.T. 364, 391, 392.   The Jeep turned left, so Merritt turned right to follow it, and he flashed his high beams of the headlights to get the Jeep driver's attention.   T.T. 365.   The Jeep stopped on William and Church Streets and appeared to be waiting for the minivan.   T.T. 365. Merritt stopped behind the Jeep, which then started to turn right on Church Street.   As Merritt turned, Killer began to shoot at the Jeep from inside the car.   T.T. 366, 392.   As Killer fired his gun, Petitioner, who had been leaning forward to find a compact disk, was "rolling on the floor somewhere" as a result of Merritt's "kind of quick" right turn.   T.T. 367.   Petitioner then jumped into the front passenger seat, where Killer was sitting, and said, "I don't got nothing to do with this, I'm out of here."   T.T. 369, 394.

According to Merritt, Petitioner then exited the van from the front passenger door and ran.  T.T. 369.

Killer and his friend shouted to Merritt to drive away. T.T. 369.  The police chased the minivan until Killer told Merritt to pull over.  T.T. 371, 395.  When Merritt did, Killer exited the van and Merritt drove off.  T.T. 371-373, 395.  The police then stopped Merritt and asked him for identification.  T.T. 373, 378, 397.  The police asked Merritt whether Merritt had a weapon. T.T. 399.  Merritt then drove home.  T.T. 399.

Following Petitioner's arrest, Killer called Merritt and threatened him if he testified on Petitioner's behalf.  T.T. 375-376.

Herbert MacDonnell ("MacDonnell"), a chemistry and forensic science professor and expert in those fields, tested Petitioner's sweatshirt jacket and determined that it did not contain gunshot residue.  T.T. 98-100.  The stains on the sweatshirt, however, resembled gunshot residue and the hole was consistent with something passing through the fabric at a high speed.  T.T. 103-107.  MacDonnell could not "explain this stain," but while the "chemistry tells me it is not gunshot residue, the physical appearance suggests it is."  T.T. 107.

### 3.  **Verdict and Sentence**

On June 14, 2007, Petitioner was found guilty of second-degree weapons possession, and two counts of third-degree weapon

possession.  T.T. 529-530.  On July 9, 2007, the court adjudicated
Petitioner a second violent felony offender.  Sentencing Mins.
[S.M.] 7-8.  The court sentenced Petitioner to a determinate prison
sentence of 15 years plus five years of post-release supervision on
the second-degree weapon possession count, a determinate 7-year
prison term, plus 3 years of post-release supervision, for the
third-degree weapon possession charge (Penal Law § 265.02[4]), and
an indeterminate prison term of from 3 ½ - 7 years on the other
third-degree weapon possession count (Penal Law § 265.02[1]).
S.M. 28-30.

### C.  Direct Appeal

Through counsel, Petitioner appealed his judgment of
conviction to the Appellate Division, Third Department on the
following grounds: (1) the trial court failed to properly instruct
the jury as to evidence of flight; (2) the evidence was legally
insufficient and the verdict was against the weight of the
evidence; (3) Petitioner's statements were improperly admitted
because the second officer to speak with Petitioner did not advise
him of his Miranda rights; (4) Petitioner's sentence was harsh and
excessive; (5) Petitioner was deprived of the effective assistance
of trial counsel; and (6) Petitioner was entitled to a Wade
hearing.  See Pet'r Br. on Appeal at Resp't Ex. A.  On December 9,
2010, the Appellate Division modified Petitioner's conviction by
reversing one of the third-degree weapon possession counts and

-10-

vacated the sentence on that count, and otherwise affirmed the conviction. People v. Garcia, 79 A.D.3d 1248, 1252 (3d Dep't 2010) (Resp't Ex. G). Leave to appeal to the New York Court of Appeals was denied on February 24, 2011. Garcia, 16 N.Y.3d 797 (2011) (Resp't Ex. I).

### D.   The Habeas Corpus Petition

This habeas corpus petition followed, wherein Petitioner seeks relief on the grounds that: (1) the County Court failed to properly charge the jury as to how to evaluate evidence of flight; (2) the verdict was against the weight of the evidence; (3) the evidence was legally insufficient; (4) ineffective assistance of trial counsel; and (5) he was entitled to a Wade hearing. See Pet. ¶ 12 A-E.

For the reasons stated below, habeas relief is denied and the petition is dismissed.

## III. The Exhaustion Requirement

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A); see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999); accord, e.g., Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994), cert. denied, 514 U.S. 1054 (1995). "The exhaustion requirement is not satisfied unless the federal claim

has been 'fairly presented' to the state courts." <u>Daye v. Attorney</u> <u>General</u>, 696 F.2d 186, 191 (2d Cir. 1982) (en banc), <u>cert. denied</u>, 464 U.S. 1048 (1984).

## IV.   The AEDPA Standard of Review

For federal constitutional claims adjudicated on the merits by a state court, the deferential standard of review codified in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies. A habeas petitioner can only obtain habeas corpus relief by showing that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(1)-(2).

## V.   Analysis of the Petition

## 1.   Trial Court Erred in Failing to Charge Jury on Limited Value of "Flight" Evidence

At ground one of the petition, Petitioner argues that the trial court erred in failing to instruct the jury that the evidence of his flight from the police as consciousness of his guilt was of limited probative value.   <u>See</u> Pet. ¶ 12A.   As discussed below, Petitioner failed to properly raise this claim in the state courts and it is therefore unexhausted for purposes of federal habeas review.

A habeas corpus petition brought by a state prisoner shall not be granted unless "the applicant has exhausted the remedies available in the courts of the State; or . . . there is an absence of available State corrective process; or . . . circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1). Furthermore, "an applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by an available procedure, the question presented." 28 U.S.C. § 2254(c).

To satisfy the exhaustion doctrine, a habeas corpus petitioner must meet a two-pronged test. First, the petitioner must "fairly present" his or her federal claim to the highest state court from which a decision can be rendered. Daye v. Attorney General of New York, 696 F.2d 186, 190-91 n.3 (2d Cir. 1982)(en banc). A claim is "fairly presented" if the state courts are informed of "both the factual and the legal premises of the claim [asserted] in federal court." Id. at 191. Second, "having presented his federal constitutional claim to an appropriate state court, and having been denied relief, the petitioner must have utilized all available mechanisms to secure state [appellate] review of the denial of that claim." Klein v. Harris, 667 F.2d 274, 282 (2d Cir. 1981) (citations omitted).

"Because non-constitutional claims are not cognizable in federal habeas corpus proceedings, a habeas petition must put state courts on notice that they are to decide federal constitutional claims." Petrucelli v. Coombe, 735 F.2d 684, 687 (2d Cir. 1984)(citations omitted). A state defendant may put a state court on notice that it is to decide a federal constitutional claim in several ways, including: (a) reliance on pertinent federal cases employing constitutional analysis; (b) reliance on state cases employing constitutional analysis in like fact situations; (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution; and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation. Daye, 696 F.2d at 194.

In this case, although Petitioner presented the factual and legal premises of his claim in his appeal to the Appellate Division, he failed to present the claim in a manner to implicate a federal constitutional issue. In the portion of his brief to the Appellate Division devoted to this issue, Petitioner framed the claim as a matter of state law, citing only to state case law to support his argument.[2]   Petitioner did not cite any federal authority or rely on state cases employing constitutional analysis

---

[2]

The Appellate Division denied this claim, finding that "defendant failed to preserve his claim that County Court erred in failing to charge the jury regarding the limited probative value of the evidence of flight, as he neither requested a specific charge to that effect nor objected to its absence." Garcia, 79 A.D.3d at 1251-52 (internal citations omitted).

in like-fact situations.  Moreover, Petitioner did not assert his claim "in terms so particular as to call to mind a specific right protected by the Constitution" or allege "a pattern of facts that is well within the mainstream of constitutional litigation." Indeed, jury instructions are typically the province of state law, and only give rise to habeas relief when the defective instruction "so infected the entire trial that the resulting conviction violates due process." Cupp v. Naughten, 414 U.S. 141, 147 (1973). Petitioner does not now argue -- nor did he do so in the state courts -- that the alleged error violated his constitutional right to a fair trial or otherwise offend federal due process principles. Accordingly, the Court finds that Petitioner failed to fairly apprise the Appellate Division of the federal constitutional dimension of this claim.  Consequently, the claim remains unexhausted.

Nonetheless, if a state prisoner has not exhausted his state remedies with respect to a claim and he no longer has a state forum in which to raise the claim, the claim may be deemed exhausted but procedurally barred.  See Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994).  In this case, Petitioner has already used his one direct appeal (see N.Y. Ct. Rules § 500.20[a]), and collateral review of the claim is foreclosed by N.Y. Crim. Proc. Law ("CPL") § 440.10(2)[a], [c] (court must deny motion to vacate where claim was previously determined on the merits on direct appeal; court

must deny motion to vacate where claim is record-based and could have been raised on direct appeal but unjustifiably was not). Accordingly, the Court deems the claim exhausted and procedurally defaulted from habeas review.

Because this claim is procedurally barred, it may only be reviewed if Petitioner establishes cause for the default and resulting prejudice, or that a fundamental miscarriage of justice will result from the Court's failure to review the claim. See e.g., Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001); accord Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011) ("If a habeas applicant fails to exhaust state remedies by failing to adequately present his federal claim to the state courts so that the state courts would deem the claim procedurally barred, we must deem the claim [ ] procedurally defaulted.'") (quoting Aparicio, 269 F.3d at 90; alteration in Carvajal). A fundamental miscarriage of justice is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent. Murray v. Carrier, 477 U.S. 478, 496 (1986). To overcome procedural default based on miscarriage of justice, petitioner must demonstrate that "in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" and would require "new reliable evidence . . . that was not presented at trial." House v. Bell, 547 U.S. 518, 536-37 (2006).

-16-

Liberally, construing Petitioner's *pro se* pleadings, he raises ineffective assistance of counsel as "cause" for the default. Indeed, attorney error that amounts to a denial of the Sixth Amendment right to the effective assistance of counsel can constitute such "cause." See Edwards v. Carpenter, 529 U.S. 446, 451 (2000); McCleskey v. Zant, 499 U.S. 467, 494 (1991). Here, however, Petitioner's stand-alone ineffective assistance of counsel claim on this basis is meritless (see discussion *infra* at section "IV, 3, (A)") and thus cannot constitute cause for the default. Because Petitioner cannot establish "cause" for the default, the Court need not consider prejudice. See McCleskey, 499 U.S. at 494 (failure to make a showing of either cause or prejudice defeats the petitioner's ability to overcome the procedural default on this basis). Moreover, Petitioner has not alleged that he is "actually innocent" to avail himself of the miscarriage of justice exception. Accordingly, this claim is procedurally defaulted from habeas review and is denied on that basis.

## 2. Verdict was Against the Weight of the Evidence and the Evidence was Legally Insufficient to Support the Convictions

At grounds two and three of the petition, Petitioner asserts that the verdict was against the weight of the evidence and that the evidence was legally insufficient to support his convictions. See Pet. ¶ 12B-C. The former claim is not cognizable on habeas review. The latter claim, which was raised on direct appeal and

determined to be unpreserved for appellate review,[3] is procedurally defaulted from review by this Court.

### (A)   Verdict Against the Weight of the Evidence

A weight of the evidence claim is "an error of state law, for which habeas review is not available." Douglas v. Portuondo, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002); Correa v. Duncan, 172 F.Supp.2d 378, 381 (E.D.N.Y. 2001) ("A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15[5]"); see also Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) ("assessments of the weight of the evidence . . . are for the jury and not grounds for reversal on appeal"). Thus, Petitioner's weight of the evidence claim is denied for failure to state a cognizable constitutional issue.

### (B)   Legally Insufficient Evidence

As Respondent correctly argues, Petitioner's challenge to the sufficiency of the evidence supporting his convictions is procedurally barred because the Appellate Division relied on an adequate and independent state law ground to deny the claim -- namely, that Petitioner made only a "general motion to dismiss at the close of the People's case and did not renew or supplement the motion upon the close of the his case or the People's rebuttal." Garcia, 79 A.D.3d at 1250; see Harris v. Reed, 489 U.S. 255, 260-61, 264 n. 10 (1989) (federal habeas corpus review of a state

---

[3] Garcia, 79 A.D.3d at 1250.

conviction is prohibited if a state court judgment is based on an "adequate and independent state ground," such when the state court "explicitly invokes a state procedural bar rule as a separate basis for decision.").  It is well-settled under New York law that a defendant must alert the trial court to the specific basis for his dismissal motion in order to preserve an appellate claim for insufficiency of the evidence.  See e.g., People v. Gray, 86 N.Y.2d 10, 19 (1995).

Although only a "firmly established and regularly followed state practice," James v. Kentucky, 466 U.S. 341, 348-49 (1984), may be deemed adequate to prevent subsequent review by a federal court, the New York contemporaneous objection rule applied by the Appellate Division in Petitioner's case -- that a motion to dismiss must alert the trial court to the specific deficiency alleged, and that any such motion must be renewed at the close of defendant's case -- has been recognized as a firmly established and regularly followed rule.  See e.g., Mills v. Poole, 06 Civ. 00842, 2008 U.S. Dist. LEXIS 108461, 2008 WL 2699394, at *10-12 (W.D.N.Y. June 30, 2008).

Procedural default will "bar federal habeas review of the federal claim, unless the . . . petitioner can show 'cause' for the default and 'prejudice attributable thereto,'" or demonstrate that "failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'"  Coleman v. Thompson, 501

U.S. 722, 749-50 (1991) (citations omitted). Petitioner has offered no "cause" for his failure to preserve his insufficiency claim, and he has not asserted an ineffective assistance of counsel claim on this basis in the habeas petition. Moreover, Petitioner cannot demonstrate prejudice insofar as the Appellate Division reviewed and rejected Petitioner's weight of the evidence claim on the merits -- an analysis that "necessarily review[ed] the evidence adduced as to each of the elements of the crimes . . . ." Garcia, 79 A.D.3d at 1250; see Parker v. Ercole, 666 F.3d 830, 833 (2d Cir. 2012) ("to the extent the Appellate Division decided that Parker's conviction was not against the weight of the evidence, it necessarily decided that there was sufficient evidence to support the verdict."). Finally, Petitioner is unable to avail himself of the miscarriage of justice exception insofar as he has not alleged that he is actually innocent of the crimes of which he was convicted. Accordingly, Petitioner's legal insufficiency claim is procedurally defaulted from habeas review and is denied on that basis.

## 3.  Ineffective Assistance of Counsel

At ground four of the petition, Petitioner claims that he received ineffective assistance of counsel on the basis that counsel failed to: (1) ensure that the County court delivered a "flight" instruction to the jury; (2) failed to object to the indictment on the grounds that one offense had been repealed and

the evidence did not support the charges; and (3) failed to object at sentencing to improper references to a plea offer that Petitioner had rejected. <u>See</u> Pet. ¶ 12D. This claim appears to be unexhausted insofar as it was never raised as a federal constitutional claim in the state courts.[4] Nonetheless, the Court finds the claim to be wholly meritless, and exercises its discretion to dismiss the petition notwithstanding Petitioner's failure to exhaust. <u>See</u> 28 U.S.C. § 2254(b)(2); <u>Pratt v. Greiner</u>, 306 F.3d 1190, 1197 (2d Cir. 2002).

The Sixth Amendment of the Constitution of the United States provides, in part, that a criminal defendant "shall enjoy the right . . . to have the Assistance of Counsel for his defense." The right to counsel is "the right to effective assistance of counsel." <u>McMann v. Richardson</u>, 397 U.S. 759, 771 n.14 (1970); <u>Campusano v.</u>

---

[4] Respondent raises exhaustion as an affirmative defense to this claim, arguing that the Petitioner failed to present this claim in the state courts as a federal constitutional issue. <u>See</u> Resp't Mem. of Law at 16. To support its position, Respondent correctly points out that, when Petitioner raised this claim on direct appeal, he did not cite to Supreme Court law, the United States Constitution, or any other federal authority (such as the federal standard, set forth in <u>Strickland v. Washington</u>, for ineffective assistance of counsel), relying instead entirely on New York law. <u>See</u> Pet'r Br. on Appeal at Resp't Ex. A. The Appellate Division summarily denied Petitioner's claim, finding, without citing caselaw, that the claim was "without merit." <u>Garcia</u>, 79 A.D.3d at 1252. Additionally, the Court points out that, when Petitioner raised this claim in his leave application, he simply reiterated the factual allegations raised on direct appeal, and did not cite caselaw in support of this claim. <u>See</u> Pet'r Leave Application at Resp't Ex. E. Finally, the Court points that Petitioner does not frame this claim as a federal constitutional violation in the habeas petition either. Rather, he asserts, in general terms, that he was "denied the effective assistance of counsel" insofar as "defense counsel made a series of errors." Pet. ¶ 12D. All of these factors militate toward a finding that the state courts were not fairly apprised of the federal constitutional dimension of this claim, and the Court therefore finds that the claim remains unexhausted for federal habeas review purposes.

United States, 442 F.3d 770, 773 (2d Cir. 2006).  In order to prevail on an ineffective assistance of counsel claim, a petitioner must meet the two pronged test articulated by the Supreme Court of the United States in Strickland v. Washington.  A petitioner must show 1) that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," and 2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 694; see also Rompilla v. Beard, 545 U.S. 374 (2005); Wiggins v. Smith, 539 U.S. 510 (2003).  Concerning the quality-of-representation prong, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and, as a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable" because judicial scrutiny of counsel's performance is deferential. Strickland, 466 U.S. at 689-90.  However, strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 691.  With respect to the prejudice prong, the United States Supreme Court has explained that "reasonable probability" of prejudice means "a probability sufficient to undermine confidence in the outcome." Id. at 694. Petitioner cannot meet this standard.

**(A)   Failure to Request a Limiting Jury Instruction Based on "Flight" Evidence**

Petitioner claims that his trial counsel was ineffective for failing to request that the court charge the jury that the evidence of his flight had limited probative value.[5]   This claim is meritless.

In this case, the testimony of Officers Comstock and Adams at trial established that, immediately after the shooting, Petitioner fled from police as they were pursuing him.   T.T. 134-137, 141, 174, 190.   In his closing statement, the prosecutor made two passing references to Petitioner's flight -- notably, in response to defense counsel's comment on summation that "[c]learly Johnnie Garcia ran."   T.T. 460, 461-487.   Petitioner faults counsel for failing to request an instruction to assist the jury in evaluating the flight evidence.   However, considerations such as trial strategy could cause counsel not to request a jury instruction.   In particular, a flight instruction in this case, while pointing out to the jury the limited probative value of flight evidence, would have revealed to the jury that flight could be considered by the jury as evidence of the defendant's own "consciousness of guilt."   Such an instruction would likely have impressed upon the jurors' minds that flight evidence could be indicative of a culpable state

---

[5]

In New York, courts will often instruct the jury, upon request, that evidence of flight as consciousness of guilt has limited probative value.   See generally, People v. Watson, 248 A.D.2d 737 (2d Dep't 1998).

of mind shortly after the incident.  Therefore, the Court cannot find that, under the facts and circumstances of this case, it was unreasonable for counsel to have chosen not to request a limiting instruction that might draw to the attention of the jury that flight was a proper consideration, and that Petitioner was prejudiced by counsel's inaction.  This portion of Petitioner's ineffective assistance of counsel claim is therefore denied.

**(B)  Failure to Object to Indictment on Various Grounds**

Petitioner claims that he received ineffective assistance of counsel because counsel failed to object to the indictment on the basis that it included a repealed Penal Law provision (related to count 2) and it contained the wrong subsection of the second-degree weapon charge (related to count 1).  This claim is meritless.

Here, Petitioner cannot demonstrate prejudice with respect to either of the aforementioned issues that he faults counsel for failing to object to.  With respect to the first issue (related to count 1) -- that counsel failed to object to the indictment on the basis that it included a repealed Penal Law provision -- the Appellate Division reversed Petitioner's conviction on that repealed count.  See Garcia, 79 A.D.3d at 1249.  As for the second issue (related to count 2) -- that counsel failed to object to the indictment on the basis that it contained the wrong subsection of the second-degree weapon charge -- the record reflects, and as the Appellate Division noted, had counsel complained about this

"technical defect," the People would have been alerted to the error and simply moved to amend the indictment. Id. Thus, there is no reasonable probability that the outcome of Petitioner's trial would have been different had counsel objected to either of theses issues related to the indictment. This portion of Petitioner's ineffective assistance of counsel claim is therefore denied.

### (C) Failure to Object to Prosecutor's Improper Comments at Sentencing

Petitioner argues that he received ineffective assistance of counsel based upon counsel's failure to object, during the sentencing phase of the trial, to the "repeated references to improper matters such as the turned down plea offer." Pet. ¶ 12(D). This claim is also meritless.

The record reflects that, during sentencing, the prosecutor, in recounting Petitioner's criminal history -- a history that was relevant to Petitioner's status as a second violent felony offender -- stated that "[e]arlier in this case a plea offer was extended of less than, obviously, than the maximum which would be 15 years." S.M. 11. During the court's sentencing remarks, it never mentioned or otherwise referenced the fact that Petitioner rejected a plea bargain. Rather, the court explained that it based its sentences on the fact that Petitioner, in 1999, had committed the same crime as the instant one by firing a semi-automatic handgun at someone in a vehicle, and that Petitioner denied he was the shooter in this incident and the 1999 incident. S.M. 19-27. Thus, even if counsel

had objected to the prosecutor's factually-accurate statement that Petitioner had rejected the plea offer, the sentencing court would have still imposed the same sentence because the sentence was based, as articulated by the sentencing judge, on Petitioner's recidivism and his failure to take responsibility for his actions. Petitioner has not and cannot demonstrate therefore that counsel's failure to object the prosecutor's statement about the plea offer was unreasonable and that it was prejudicial. Accordingly, this portion of Petitioner's claim is denied.

In sum, Petitioner's claim that he received ineffective assistance of counsel is meritless, and does not warrant habeas relief. The claim is therefore denied in its entirety.

**4.    Deprivation of <u>Wade</u> Hearing**

At ground five of the petition, Petitioner claims, as he did on direct appeal, that he was entitled to a <u>Wade</u>[6] hearing because "the arresting officer was permitted to identify [Petitioner]." Pet. ¶ 12(E).  The Appellate Division rejected this claim finding that it was unpreserved for appellate review. <u>Garcia</u>, 79 A.D.3d at 1251.  Consequently, this claim is procedurally defaulted from federal habeas review.

---

[6]

<u>United States v. Wade</u>, 388 U.S. 218 (1967).  The purpose of a <u>Wade</u> hearing is to determine whether identification testimony should be suppressed because the manner in which the identification of the suspect was obtained was unduly suggestive.  <u>See</u> <u>Blas v. Herbert</u>, 2003 U.S. Dist. LEXIS 19518, 2003 WL 22480093, at *3 n.2 (S.D.N.Y. Oct. 31, 2003) (citing <u>Wade</u>).

As set forth above, "[u]nder the independent and adequate state ground doctrine, a federal court sitting in habeas 'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" Richardson v. Greene, 497 F.3d 212, 217 (2d Cir. 2007) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991). In this case, the Appellate Division relied upon New York's preservation ruled, codified at CPL § 470.05(2), to deny Petitioner's claim. In New York, the "firmly established and regularly followed rule," Lee v. Kemna, 534 U.S. 362, 386 (2002), is that "points which were not raised at trial may not be considered for the first time on appeal." People v. Thomas, 50 N.Y.2d 467, 471 (1980) (citing CPL § 470.05(2)). A party must make a specific protest at the time of a claimed error to preserve an issue for appellate review. People v. Robinson, 88 N.Y.2d 1001, 1002 (1996) ("to frame and preserve a question of law reviewable by this Court, an objection or exception must be made with sufficient specificity at the trial, when the nisi prius court has an opportunity to consider and deal with the asserted error."). "The Second Circuit has recognized that New York's preservation rule typically constitutes an independent and adequate state procedural ground on which the Appellate Division may deny a criminal defendant's appeal." Kemp v. New York, No. 07 Civ. 6996(RMB)(HBP), 2009 WL 306258, at *9

(S.D.N.Y. Feb. 9, 2009) (citing Garcia v. Lewis, 188 F.3d 71, 76-77, 79 (2d Cir. 1999); Clark v. Perez, 510 F.3d 382, 390 (2d Cir. 2008); Richardson v. Greene, 497 F.3d 212, 217-18, 220 (2d Cir. 2007); Brown v. New York, 04-CV-1087 (NG)(WP), 2006 WL 3085704, at *2 (E.D.N.Y. Oct. 30, 2006)). Under the circumstances presented here, the Court finds that the Appellate Division relied upon a state ground that was both independent of the federal question and adequate to support the judgment when it denied Petitioner's claim based upon his failure to request a Wade hearing in the County court, thereby failing to preserve the issue for appellate review.

Petitioner has not alleged the requisite "cause" and "prejudice" to overcome the procedural default, nor has he attempted to demonstrate that this Court's failure to consider the claim will result in a "fundamental miscarriage of justice." Accordingly, this claim is procedurally defaulted from habeas review and is denied on that basis.

## V.   Conclusion

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. No. 1) is denied, and the petition is dismissed. Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability. See, e.g., Lucidore v. New York State Div. of

<u>Parole</u>, 209 F.3d 107, 111-113 (2d Cir. 2000).  The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person.  <u>Coppedge v. United States</u>, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED**.

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    July 17, 2012
          Rochester, New York